Good morning, Your Honors. Tim Sperling on behalf of Appellant Plaintiff Michael Puchtler. May it please the Court. This case concerns what the SEC characterized as the single largest sale of unregistered securities in U.S. history, involving $18 billion of unregistered securities sold by Barclays between 2019 and 2022. The security at issue in this dispute, the VIX, is one of the securities that was massively oversold during that period. The VIX is an ETN designed by Barclays to track market volatility. As a volatility security, half the market goes long, the other half goes short. Because so much of the security is sold short, short sellers are especially reliant on the issuer, Barclays, maintaining issuance capacity. Without that capacity, short sellers are susceptible to a short squeeze. When the issuer is a WIXI issuer, and only the largest issuers in the country are given that designation by the SEC, maintaining capacity is not difficult. WIXI issuers can issue an unlimited number of securities. But if the issuer loses that status, then it becomes much harder for the issuer to issue securities. Non-WIXI issuers must file registration statements with an issuance capacity and pay for that capacity up front, a process that can take several weeks or a month. Second, they must develop internal controls to ensure that they do not overrun that issuance capacity. That task is especially important for large issuers like Barclays, where they issue multiple, where multiple departments issue securities from the same shelf registration statement. I don't think there's much issue here that you've adequately pleaded that they didn't have controls and that they made representations that they did. I think the district court's concern here was with, with your pleadings respecting Sienta and loss causation. So do you want to tell us why you think the district court erred on those, those determinations? Yes, absolutely, Your Honor. Thank you for... Plaintiff's claim for Sienta is that the defendants were reckless in making their statements when they knew or had access to information suggesting that their statements were false. That's from NOVAC. Defendants, meanwhile, contend that this part of their business was too insignificant and too far removed for the individual defendants to know that they lack these controls. That contention, given the facts we've alleged, is absurd. The facts readily establish that the individual defendants not only had access to contrary information, but that they knew they lacked controls from day one. What are these facts? They knew Wixie status, of course, was important to the company. They knew they lost Wixie status in 2018 and had to file a registration statement with that capacity limit that I mentioned earlier. Moserio and Staley, two of the individual defendants that we identified, signed the very documents with the SEC, causing the status change to occur, and then filing the F3 immediately thereafter with the limit on it. There was an explanatory note in connection with that filing that said the reason why we're doing it is because we lost our status. And then on top of that, what do we... Well, that's the point at which they, your allegation has to be that they knew that something that they had disclosed was false or had become false, right? That's correct. So they knew that they had lost Wixie status. Where do you allege then that as a result of that, that they also knew that the controls, internal controls had become inadequate? So the first point on that is it's obvious given the change of status. That's where I was starting the whole discussion. When you go from Wixie to non-Wixie, it's obvious when you have a company the size of Barclays, that you need to implement controls to make sure that those different departments aren't stepping on each other, planning to issue the same securities that another department perhaps is issuing. They're all issuing from the same shelf. But there was a working group convened, right? Yes. And so why isn't it, I know you argue recklessness, but why isn't it equally plausible to believe the working group was convened and the individual defendants just failed negligently to monitor its activities? Well, so I don't think you can fall into a negligence scenario once you know that you have a significant problem requiring a working group to work it out. You're aware of the problem at that point. You've assigned, you've put together a working group to presumably address the problem. At that point, it's your obligation to monitor that group to ensure the group at the end of the day addresses the issue that you're aware of it to begin with. And by failing to do that, that was reckless. Judge Fela, and I know her opinion was withdrawn, but her logic was quite sound, said that the existence of the working group just brings into stronger focus the defendant's recklessness here. And I think that's exactly right. They knew they had a problem day one. It was a big deal. They had, they convened a working group. They knew that they lacked controls at that moment. They never received any information after that point to suggest that the working group actually ended up addressing the very problem that they knew existed. That's recklessness. Well, do we know anything, and I know, I realize this is at the pleading stage, as to who the working group was responsible to, who they, their members reported to? Is there anything that would link them to the named defendants here? So we point this out in our briefing. There's the SEC order that reveals quite a bit about the working group. And, of course, we haven't engaged in a discovery, so we don't know much. But we have a lot of very specific allegations here. We're not just relying on the high-level positions in the organization to get to these allegations. But to answer your question, yes, in the SEC order, there's a reference to the term certain personnel knew of the need for controls. At the time they implement the working group and when they filed their F3s, both in 2018 and in 2019, that's paragraph 5 and 19 of the SEC order. It's referring to the certain personnel. The defendants argued that that term is most logically read to be the working group. I don't think so. They knew how to refer to the working group in that order. They didn't with respect to these two paragraphs. Instead, they refer to certain personnel. And the most logical reading of that phrase is that it's high-level people, like the individual defendants, that could put the working group together and were charged with monitoring that working group. Well, we don't believe such is your answer. There's one other critical fact here that the district court kind of overlooked, which is in Barclays 1, this is the case where the shareholders brought a suit against Barclays in front of Judge Phelan. The defendants took the position in that case that the individual defendants actually knew. They took a position that confirmed that, in fact, the individual defendants knew. They just took the position, well, we assigned it to the working group. So that confirms the very fact that is kind of at issue and ultimately troubled the district court. The district court said there was no facts. We think there's plenty of facts. And on top of it, they admitted it in the prior case. And afterwards, they self-disclosed to the SEC. And I guess I'm wondering what your theory is of motivation here. You've emphasized recklessness. I understood from the complaint that it was easier in the moment, I think, was your language in that they assumed they could get away with it. But then there's the working group, and then they self-disclosed. I don't quite understand that theory, but isn't it at least as, if not more plausible, a theory of what the district court found of negligent mismanagement? No, because at the end of the day, I think the key issue is what they knew day one. They knew that they lacked these controls. They convened the working group, and they never received any information thereafter that the working group ended up accomplishing what they thought the working group was doing. In the face of that initial knowledge that you're lacking controls, you have an obligation to ensure that issue that you're aware of actually is addressed. So was the working group, in your view, was the working group just a show? Or did they actually learn something? What happened there? No, I think the working group was intended to address the issue that Wixie caused on the company. I think if we're searching for why a reason why it wasn't addressed, certainly the defendants, individual defendants, knew they lacked controls day one when they imposed the working group. Part of what I was trying to explain at the outset was it's impossible to believe that the individual defendants thought day one they had the controls in place, and they came out of the gate saying we had adequate controls, notwithstanding the fact that they knew this was going to take months to address. They had to develop the technology. They had to implement it. They had to train personnel. And notwithstanding the fact that they knew all of this stuff had to take months to accomplish, day one they said we have these controls in place. That's impossible to, excuse me, go ahead. I do want to raise a concern with you about the causation element, because even if you were to persuade us on the Sientra one, you still have to plausibly plead causation. I believe your adversary in the district court thought that since Barclays could stop trading in this for any reason whatsoever, and that purchasers were advised of that in advance, and that that's what caused the price fluctuation that resulted in your client's loss, that you failed adequately to plead that the cause of the loss was the fraudulent statement. Do you want to tell us quickly why you don't think that should persuade us? Yes. This falls right into the camp of Vivendi and Lentil. The loss here was caused by defendants' reckless statements. Plaintiffs suffered a loss as a consequence. Tell us that, when what really caused the market fluctuation was the cessation of trading. Correct. It was the halting of the securities that caused the short squeeze to ensue. But then you must ask yourself what caused the halting of the securities. Why? Why do we have to ask that? Because this is a risk that was concealed by the misinformation that we are complaining about. So defendants came out and said that we have adequate controls, which concealed the risk that they didn't have controls, which made the halting far more likely than what they otherwise believed. Correct me if I'm wrong. When your clients purchased and were told that the cessation could be for any reason, that was before this problem arose. It was at the same time that they were making the same disclosures that we otherwise have adequate controls. That's precisely the issue, is that they are telling the market from day one that we have appropriate controls in place to deal with these significant issues in the face of changes going from WIXI to non-WIXI. And in the face of that, people relied on it and made their choices based on that information. And just because you disclose a warning doesn't mean you can disclose something that misrepresents something else that impacts the market's assessment of that risk. And there's lots of cases. I think Vivendi says that. This is precisely that scenario. Yes, they said that this could happen. And if they said nothing else, perhaps they would have been fine and we would have no claim. But at the same time, they are saying we have controls in place, which made us or our plaintiffs believe that this risk was low when had they told the truth, it would have been very high. And then ultimately the risk materialized. And this is precisely the harm that came out of that is precisely this. Right down the middle of the lane, I think, for Lentil. And to answer your question about making disclosures ultimately about this warning, I said it before a moment ago, but the mere fact that they disclose of a warning doesn't license somebody to come out and say something else that is false, that impacts the market's assessment of that risk. Investors care about possibilities and probabilities. And here at every stage, we could have reacted to the misconduct information. Some of the cases that were cited by the district court, he cited Rockman. It was overturned. I mean, that can't stand. And then in addition, the other big case is Fershman. And Fershman is easily distinguished. In that case, the misinformation came at a time where plaintiffs couldn't react to it. In our case, the misinformation came from day one and it existed in the marketplace all along. So thank you very much. I appreciate it. Anything else? I'm sorry. No, we'll hear from your adversary. Okay. Thank you. May it please the Court, Jeff Scott from Sullivan and Cromwell, on behalf of Barclays and the three individual appellees. This Court should affirm Judge Lyman's decision for, because of Plano's failure to meet three requisite elements of Section 10B. Let's start with Sienta, and then we'll move to law's causation to address the two topics raised by Your Honor. They've acknowledged here they're not proceeding on actual intent, conscious misbehavior. And so that leaves us with recklessness. So what is recklessness? Some get confused about that. They think it might be a heightened form of negligence. But this Court said in Strait v. McClure, it's not a heightened form of negligence. What it is, is actually a conscious disregard for a known risk that approximates actual intent. This is a fraud case. It's not a negligence case here. The plaintiffs here don't come remotely close to pleading recklessness. Judge Lyman was entirely correct that they were asking the wrong question. When you think about recklessness, you have to be aware of a known risk that might contradict the statements that you're making. So what is the known risk? The plaintiffs here argue the known risk was the loss of Wixie status, right? The ability to use the pay-as-you-go shelf. But that, Judge Lyman said, that's the wrong question, and we agree with that. The known risk here was that did Barclays put in controls to make sure they were tracking and counting? And here the complaint fails miserably in pleading that the three individual defendants, remember, it's the individual defendants who were the makers of the statement, and they would have had to proceed based on the known risk that known was tracking or counting. What was their supervisory responsibility vis-a-vis the working group? They had, there was no allegation that any of these senior executives, now remember, two of these, one was the current CEO, one was the former CEO, the other was the CFO. There's nothing in the complaint that those three most senior executives, banked as 140,000 employees, was supervising the working group. Well, let's assume that 138,000 of those employees would not have had any relationship with the working group. I mean, this is a plausibility standard. Barclays had a serious problem. It created a working group to address it. And isn't it a fair inference that these top management people would have had responsibility for ensuring that the working group was indeed carrying out its tasks? No, it is. It would be irresponsible, if not reckless of them, to close their eyes to whether or not the working group was doing anything? Your Honor, no, that is not a fair inference. Okay, help me out then. It is not a fair inference under this Court's case law. The Court has said in the Woodley case, and this is Woodley v. Wood, that you can't show recklessness by saying that someone had a duty to review the company's controls. There have to be specific allegations that show the defendants were aware of the lack of control. Well, some of those cases deal with the adequacy of controls, reviewing the adequacy of controls. Here, the question is whether Barclays is representing it has controls, an inquiry by management would have revealed there were no controls in place. And that's why I'm asking you, is possibly distinguishable from some of our other cases. Why not? Well, the South Cherry Street case from this Court specifically rejects that proposition, that if the individuals would have inquired, they would have found out. That is just a should have known allegation. And in South Cherry Street, this Court specifically rejected that allegation. It goes back to my first inquiry about what the lines of responsibility were. And I'm not sure how plaintiff is expected to know that exactly before discovery. They have an obligation. Who would we assume the working group reports to? The working group can report to any middle manager, any senior executive within the bank. You're talking about the CEO of the bank and the CFO of the bank in that position. There is nothing in the complaint or the SEC's order that suggests that any of those individuals had any responsibility with respect to the oversight of the control here. What about the concession plaintiff attributed to you in your argument, in its argument in the case in front of Judge Fela? There is no concession there. We simply took the allegation as pled by the plaintiff. And so it's not a concession, Your Honor. We just took it as true as you must when you're dealing with a complaint and moving to dismiss. Okay. I just wanted to be sure I understood that. Thank you. You're welcome. Now, Judge Fela also, after we settled the case, took the remarkable step of withdrawing her opinion, meaning it has no precedential value, and Judge Lyman, in a reasoned opinion, expressly disagreed with it. I understand. So they can't rely on the Judge Fela opinion here. So how do we know they haven't pled the recklessness standard? Because most of the arguments that are set forth in the briefs before this Court are not even in the complaint. So the plaintiffs now claim, because they know they haven't pled recklessness, and this is at pages 43 to 44, that before March 8, 2022, the individuals were aware that Barclays was not tracking issuance. That is false. It's not in the complaint. It's not a reasonable inference. They also now say that the working group was never authorized by the individual defendants to implement the control. As Judge Lyman said, that's irrational. It's very easy for bankers with MBAs to count securities. There would be no reason that the executives here, the most senior executives, would think that the 140,000 bankers couldn't count the securities. Thus, they weren't aware of the risk here that no one was tracking and counting. In addition to that, going to Judge Park's question earlier, you have to weigh the competing inferences. The plaintiff complains about it in the papers before this Court, but that's exactly what the PSRA tells Judge Lyman to do. You look at the inference of fraudulent intent, and it has to be as cogent and as compelling as the inference of non-fraudulent intent. And here, there was a mistake made as soon as the executives, the senior executives, were aware of that. They could have hid the fraud, but what they did instead, they disclosed it to the market, they disclosed it to the regulators, they announced that they were going to conduct an independent investigation and disclose the results of that investigation, and then they said they were going to conduct a voluntary rescission offer that cost the bank billions of dollars to undertake. They would not have done that if, in fact, they were conducting a fraud here. And so they fail in this score, too. So not only did Judge Lyman say their allegations aren't sufficient on Sienter, that they also did not, when you look at the competing inferences, the inference of non-fraudulent intent is much more powerful here. It's not even close to being a tie. So on the question of Sienter, Judge Lyman got it right. He also got it right with respect to the issue of loss causation. Here, Barclay's disclosed in the VXX prospectus document that it had a control of loss causation. I just want to ask one more question about Sienter. It's an odd defense. It sounds like what you're saying is this is so obvious. They know how to count securities that this couldn't have been fraud. But doesn't that sort of support the recklessness argument that once they lost Wixie status, then the controls were going to need to be different, that we're going to suddenly need to count the securities that hadn't been counted before? And then doesn't that mean that the executives knew that there was something that had to be changed? No, because for the question of conscious disregard, you have to make your statements knowing there's a risk that there's information that contradicts it. What you would need to know here was no one was tracking and counting these securities. So everyone assumed that that was happening, and it wasn't. And so that's negligence that you should have known. And that's why Judge Lyman got it 100 percent right when he said these are just should-have-known allegations. Now, with respect to loss causation, they disclosed in the VXS-based registration statement that for any reason, at any time, Barclays could stop issuing the ETNs. There was no limitation to those reasons. In fact, they could encompass legal reasons, like you've gone over the limit here. So they were fully on notice that Barclays, for any reason whatsoever, could stop issuing these securities. Why is that enough for loss causation? I mean, they — surely the buyers of these options would have wanted, if they had known the information, that Barclays had no internal controls. They would have made different decisions about buying options. Your Honor, they were buying a security that they knew for any reason Barclays could just back away from the market. It could be because of mistake. It could be because they exited the business. Because of that, then — But the chance that Barclays would need to stop issuing securities because it had over-issued and would need to report is markedly higher if there are no internal controls. Your Honor, I don't — I see that my time is just about up here. May I answer your question here? Your Honor, I think from a loss causation perspective, if you think about Vivendi, which I know you were on the panel for that, and you heavily cited the Lentil decision, right? So if we just talk about zone of risk for a minute, right? So what the zone of risk argument says, and I think we have to understand the doctrine here, zone of risk actually says that when you're reading a statement of the company, either in the VXS-based registration statement or in its SEC filings, is there something the company said that a reasonable investor would have concluded that the risk of an event occurring was either remote or highly unlikely? That's the language from the cases Vivendi cites at its in Lentil. Here, Barclays did not guarantee that there wouldn't be a control failure. It said nothing in its control statements around the tracking and counting. In addition, in the VXS-based registration statement, it said it had a contractual right to suspend it. So no reasonable investor would have concluded, in light of those panoply of disclosures, that the risk that there would be no control in place was remote or highly unlikely. So it fails the Vivendi Lentil test. And as a result of that, what caused the losses here was an exercise of its contractual right, and then the trading stopped. People rushed in, bought the ETNs, and it caused their loss. We disclosed, in fact, that could happen. And so they haven't satisfied loss causation. The last thing I would say, Judge Lyman got it right with respect to the control statements. There are no SOC certification statements because they didn't plead that there were false when made. They also don't argue it on appeal. And the last point is, with respect to the VXS registration statement, that was a statement that they would sell in the future, they admit it was true when made, and the duty to update is not triggered, is not triggered until you learn about the contradictory information. And so when they were purchasing the securities, none of the executives knew about it, and so that duty was never triggered. So thank you. This Court should affirm Judge Lyman's opinion. We'll hear rebuttal. I'm going to try to do this as quickly as I can, so forgive me if I speak quickly. Plaintiffs have pledged sufficient facts to lead to a strong inference of Center. This was a big deal. Everyone in the company knew about it. They empaneled a working group. The SEC order refers to certain personnel, which is most logically interpreted to be high-level personnel. The individual defendants signed the documents causing the changes to occur with a new F3 registration limit. In that document, it refers to the fact that they're doing that because of the changed status. They empaneled a working group at the same time that that's occurring. They know they have a problem in that moment. And then they admitted it in the prior case. They're walking back on that now because Judge Failage saw through it, and it's not a very good defense to say, well, we knew, but we tasked the working group, because at the end of the day, in that case, you have an obligation to actually look into the working group and make sure they do it. We've alleged certainly enough to get through pleading, enough here strong facts showing that these individual defendants knew. Why would they not want to disclose day one the truth? That would have been a very uncomfortable disclosure for them to tell the entire world that, hey, we've got a problem. We know we've got a problem. We're going to try to address it. But in the meantime, we're flying blind. So and that would have affected 20 different securities with unknown repercussions. So there's a cogent explanation if we were to go searching for a motive why these individuals would have acted the way they did. We're alleging recklessness. We don't need to come forward with a motive. But if we were to search for one, that's a perfectly sound one, certainly more cogent than these individuals didn't know. All right. Let me move on to materiality. We've alleged materiality. These individuals made the impression to the market that this particular issue was addressed. And defendants themselves admitted that a reasonable investor would have come to this conclusion. They amended them. They submitted a updated 2021 F.A. that revised the very control statements that we say are false. I can run through those if Your Honor would like me to do so. I'd be happy to do that. They're in your brief. Okay. Thank you very much. And the last point on loss causation, I do think this is right down the middle of the bowling lane for loss causation. This is a risk that was concealed by the information, misinformation that they put into the marketplace. Certainly, no, the investors did not come into this thinking that there was a high risk that Barclays was suddenly going to halt. They disclosed that, but they think it's a low risk in light of the controls that they otherwise stated that they had. Had they told the truth and said that they actually didn't have these controls, then yes, the market would have appreciated that this was a very high risk and they wouldn't have gone short. You'd have to be crazy. When this whole thing went down, 95% of the market disappeared. 95% of the volume disappeared. And it disappeared for six months. This was the most highly traded volatility security in the world. And all of those investors disappeared for six months. That's because this information was so significant that it caused that kind of devastating consequence to the security. Thank you very much. Thank you both, and we'll take the matter under advisement.